**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Marilyn Kelly

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway

JULY 21, 2009

UNITED STATES FIDELITY INSURANCE &
GUARANTY COMPANY,

      Plaintiff-Appellee,

v                               No. 133466

MICHIGAN CATASTROPHIC CLAIMS
ASSOCIATION,

      Defendant-Appellant,

and

MICHAEL MIGDAL, Individually and as
Conservator for the Estate of DANIEL MIGDAL,
a Protected Person,

      Defendant.

---

HARTFORD INSURANCE COMPANY OF THE
MIDWEST,

      Plaintiff-Appellee,

v                               No. 133468

MICHIGAN CATASTROPHIC CLAIMS
ASSOCIATION,

      Defendant-Appellant.

---

BEFORE THE ENTIRE BENCH

1

WEAVER, J.

This Court originally granted leave to appeal to consider whether MCL 500.3104(2) obligates the Michigan Catastrophic Claims Association (MCCA) to reimburse a member insurer for personal protection insurance (PIP) benefits paid to a claimant without regard to the reasonableness of the member insurer's payments of PIP benefits. This Court issued an opinion reversing the Court of Appeals and remanding for further proceedings, while holding that "when a member insurer's policy only provides coverage for 'reasonable charges,' the MCCA has authority to refuse to indemnify unreasonable charges."[1] Subsequently, plaintiffs United States Fidelity Insurance & Guaranty Company and Hartford Insurance Company of the Midwest filed motions for rehearing. We granted the plaintiffs' motions for rehearing, and these cases were resubmitted for decision without further briefing or oral argument.[2]

We now hold that the indemnification obligation set forth in MCL 500.3104(2) does not incorporate the reasonableness standard that MCL 500.3107 requires between claimants and member insurers. Furthermore, the powers granted to the MCCA in § 3104(7) are limited to adjusting the "practices and procedures" of the member insurers and do not encompass adjustment to the

---

[1] *United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n*, 482 Mich 414, 417; 759 NW2d 154 (2008).

[2] *United States Fidelity Ins & Guaranty Co v Mich Catastrophic Claims Ass'n*, 483 Mich 918 (2009).

2

payment amount agreed to between claimants and member insurers. Moreover, we hold that the power granted to the MCCA under MCL 500.3104(8)(g) is limited to furthering the purposes of the MCCA and that determining reasonableness is not one of its purposes. Finally, although the MCCA has no right to directly challenge the reasonableness of a claim, the no-fault statute does provide the MCCA with safeguards against negligent actions of member insurers. Accordingly, we affirm the judgment of the Court of Appeals.

I. Facts and Procedural History
*United States Fidelity Insurance & Guaranty Co v MCCA*

In the first case in these consolidated appeals, Daniel Migdal was injured in a 1981 car accident in which he sustained catastrophic injuries. His injuries included a traumatic brain injury with cerebral spastic quadriplegia, severe oral motor apraxia, and dysphasia. Because of the extent of the injuries, Daniel was prescribed, and received, 24-hour-a-day nursing care. In 1988, Michael Migdal (Mr. Migdal), Daniel's father and the conservator of Daniel's estate, sued the no-fault insurance provider, United States Fidelity Insurance & Guaranty Company (USF&G), to recover expenses paid for Daniel's care. In 1990, the parties entered into a consent judgment. Pursuant to the judgment, USF&G paid Mr. Migdal $35,000 in exchange for a release from all contractual liability for nursing care provided before May 10, 1989. Additionally, USF&G agreed to pay $17.50 an

3

hour for Daniel's home nursing care for the following year.[3]  The payments would be made regardless of whether Daniel's parents provided the nursing care or a third party was brought in to provide the care.  The hourly rate, fixed for the first year after the judgment, was subject to an annual increase of 8.5 percent.  The increased rate would be compounded based on the previous year's rate.

Pursuant to the consent judgment,  USF&G paid Mr. Migdal the consented-to hourly wage.[4]  Once the amount paid to Mr. Migdal had reached the statutory threshold amount of $250,000,[5] the MCCA began to reimburse USF&G for payments made to Mr. Migdal that exceeded the threshold.  However, after the hourly rate had increased significantly with the passage of time, the MCCA eventually refused to reimburse USF&G for amounts that USF&G paid Mr. Migdal under the consent judgment, on the ground that the amounts were

---

[3] Mr. Migdal created a company to manage Daniel's care.  This company acted as an intermediary that used the benefit payments from USF&G to pay the hired nurses that cared for Daniel and to pay Mr. Migdal for his efforts in Daniel's care.  The judgment contained a provision stating that if Daniel's condition substantially changed, the court retained jurisdiction and could determine whether a reduction or increase in the payments was "warranted."

[4] Mr. Migdal testified that his duties included reading papers concerning business management and medical advances, checking and providing maintenance of Daniel's equipment, keeping the books, paying the nurses, and shopping for necessary items for Daniel's care.

[5] MCL 500.3104(2) reads, in pertinent part:

> [T]he association shall provide and each member shall accept indemnification for 100% of the amount of ultimate loss sustained under personal protection insurance coverages in excess of the following amounts in each loss occurrence . . . .

At the time of both accidents involved in these consolidated appeals, the threshold amount was $250,000.

4

unreasonable. In 2003, USF&G filed a complaint in the Oakland Circuit Court for a declaratory judgment that the MCCA must reimburse USF&G for the total amount that USF&G paid to Mr. Migdal under the consent judgment, regardless of the reasonableness of the amount. At the time, USF&G was paying $54.84 an hour to Mr. Migdal for Daniel's nursing care.[6] The MCCA sought to only be required to reimburse USF&G at a rate of $22.05 an hour, arguing that the agreed-upon rate of $54.84 an hour was unreasonable and, therefore, the MCCA should not have to reimburse USF&G for the total amount. Meanwhile, USF&G sought to have the consent judgment with Mr. Migdal revised, arguing that circumstances had changed when Mr. Migdal hired a third party to care for Daniel instead of providing the nursing care himself. Mr. Migdal filed a motion for summary disposition for failure to state a claim. The court granted Mr. Migdal's motion.[7]

Likewise, the MCCA moved for summary disposition. It contended that there was no question of material fact that the payments made by USF&G to Mr. Migdal were unreasonable. Moreover, the MCCA argued that the no-fault act only required reimbursement of payments that are reasonable. In a countermotion for summary disposition, USF&G argued that the no-fault act required the MCCA to reimburse it for the full amount paid to Mr. Migdal, despite any

---

[6] Mr. Migdal paid $32 an hour of this amount to the nurses (including benefits) and kept the rest as compensation for his work.

[7] USF&G did not appeal that decision. We therefore express no opinion on whether the consent judgment would have been subject to judicial modification on the ground that the payment amount it called for had become unreasonable with the passage of time.

unreasonableness regarding the amount paid. Alternatively, USF&G argued that there was a question of material fact concerning the "unreasonableness" of the consent judgment.

The trial court granted USF&G's motion for summary disposition, ruling that the MCCA must reimburse USF&G for its "ultimate loss,"[8] including the entire amount that USF&G had to pay Mr. Migdal regardless of whether the amount paid was reasonable. The trial court denied the MCCA's motion for summary disposition. The trial court entered a judgment requiring the MCCA to reimburse USF&G in the amount of $1,725,072 under the no-fault act and holding the MCCA liable for future payments consistent with the consent judgment. The parties agreed to stay the enforcement of the order while the MCCA appealed by right in the Court of Appeals.

*Hartford Ins Co v MCCA*

In the second case of these consolidated appeals, Robert Allen was injured in a 2001 car accident in which he sustained catastrophic injuries. His injuries included right-sided pleuritic effusion, brain injuries, quadriparesis, bilateral frozen shoulder, and cardiopathy. Because of the extent of the injuries, Allen was prescribed, and received, 24-hour-a-day care by a licensed nurse. Hartford Insurance Company of the Midwest (Hartford), Allen's no-fault insurer, initially paid $20 an hour for the nurse. In 2003, Hartford agreed to pay an increased rate

---

[8] MCL 500.3104(2).

of $30 an hour for Allen's care. Soon thereafter, Hartford's payments for Allen's care exceeded the $250,000 statutory threshold.

The MCCA refused to reimburse Hartford for any payments above $20 an hour for the services rendered. Hartford filed a complaint for a declaratory judgment that would require the MCCA to pay Hartford $571,847.21 as reimbursement for payments exceeding the no-fault threshold. Additionally, Hartford sought a declaration that the MCCA must reimburse Hartford for the total payments above the $250,000 threshold, regardless of the reasonableness of the payments. After the initial filing, Hartford moved for summary disposition, arguing that the no-fault act required the MCCA to reimburse Hartford for the entire amount paid to Allen that exceeded the threshold, regardless of the reasonableness of that amount. The MCCA argued that it only had to reimburse Hartford for reasonable payments and that there was insufficient discovery concerning the reasonableness of the amount of the payments. The circuit court ruled that reasonableness was an element in determining how much the MCCA must reimburse Hartford and that there was insufficient discovery to determine if the payments were reasonable. Hartford immediately appealed the trial court's holding requiring the element of reasonableness to be considered.

The Court of Appeals Decision

The Court of Appeals consolidated the USF&G and Hartford cases and held that "*MCL 500.3104* does not incorporate a 'reasonableness' requirement and requires the MCCA to reimburse insurers for the *actual* amount of PIP benefits

7

paid in excess of the statutory threshold."[9]  (Emphasis in the original).  The

MCCA sought leave to appeal in this Court, and this Court granted leave.[10]  This

Court issued an opinion reversing the Court of Appeals and remanding for further

proceedings, while holding that "when a member insurer's policy only provides

coverage for 'reasonable charges,' the MCCA has authority to refuse to indemnify

unreasonable charges."[11]  Subsequently, plaintiffs United States Fidelity Insurance

& Guaranty Company and Hartford Insurance Company of the Midwest filed

motions for rehearing.  We granted the plaintiffs' motions for rehearing and this

case was resubmitted for decision without further briefing or oral argument.  483

Mich 913 (2009).[12]

---

[9] *United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n*, 274 Mich App 184, 192; 731 NW2d 481 (2007).

[10] 481 Mich 862 (2008).

[11] *United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n*, 482 Mich 414, 417; 759 NW2d 154 (2008).

[12] Justices Corrigan and Young were simply shown as denying the motions for rehearing.  However, Justice Young, in his dissent joined by Justice Corrigan, now takes the opportunity well after the motions for rehearing have been decided to attack the remaining justices who did not vote to retain this Court's earlier decision.

The dissent erroneously asserts that the justices voting to grant rehearing erred because *Peoples v Evening News Ass'n*, 51 Mich 11, 21; 16 NW 185 (1883), held that this Court is precluded from granting rehearing when the composition of the Court has changed, absent any new arguments from the parties in the cases. However, contrary to the dissent's assertions, this Court merely stated in *Peoples* that a change in the composition of this Court cannot be the *basis* for granting rehearing.

Accordingly, if the composition of the Court changes, and the composition becomes such that a majority of the Court sees a reason to grant rehearing, the majority is not precluded under *Peoples* from granting rehearing.  If, for instance, four justices on the newly composed court concluded that the challenged opinion

## II. Standard of Review

Statutory interpretation is a question of law, which this Court reviews de novo. *In re Investigation of March 1999 Riots in East Lansing (People v Pastor)*, 463 Mich 378, 383; 617 NW2d 310 (2000). This Court reviews de novo a trial court's decision regarding a motion for summary disposition. *Herald Co v Bay City*, 463 Mich 111, 117; 614 NW2d 873 (2000).

## III. Analysis

The issue before this Court involves how much of a member insurer's coverages the MCCA must indemnify in the event of a catastrophic injury. Specifically, is the MCCA liable for reimbursement of PIP payments based on potentially unreasonable claims?

The outcome of these cases depends on this Court's interpretation of the language in MCL 500.3104. An overarching rule of statutory construction is

---

was erroneous, those justices can vote to grant rehearing. The same holds true whether the deciding vote is a new justice who joined the court after the challenged opinion was released or whether the deciding vote comes from a justice who signed the challenged opinion and changed his or her mind after further consideration.

This practice is consistent with MCR 2.119(F)(3), which creates a "palpable error" standard for rehearing cases. It is up to the moving party to show palpable error that would lead to a different disposition in the case. If a majority of the Court is convinced by the moving party, the Court has the discretion to grant rehearing. Furthermore, while MCR 2.119(F)(3) states that a motion for rehearing will generally not be granted if the motion only presents the same arguments decided in the original disposition of the case, MCR 2.119(F)(3) explicitly refrains from "restricting the discretion of the court" to grant rehearing.

Accordingly, we are not persuaded by the dissent's attempts to discredit this Court's order that granted rehearing in this case.

9

"that this Court must enforce clear and unambiguous statutory provisions as written." *In re Certified Question (Preferred Risk Mut Ins Co v Michigan Catastrophic Claims Ass'n)*, 433 Mich 710, 721; 449 NW2d 660 (1989) (quotation marks omitted). "If the language of [a] statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written." *Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999). However, "what is 'plain and unambiguous' often depends on one's frame of reference." *Shiffer v Gibraltar School Dist Bd of Ed*, 393 Mich 190, 194; 224 NW2d 255 (1974). In order to ascertain this frame of reference, the contested provisions must be read in relation to the statute as a whole and work in mutual agreement. *In re Certified Question*, 433 Mich at 722. See also *State Treasurer v Wilson*, 423 Mich 138, 144; 377 NW2d 703 (1985).

Additionally, the frame of reference shares a deep nexus with the intent of the Legislature. "The primary goal of statutory interpretation is to give effect to the intent of the Legislature." *Title Office, Inc v Van Buren Co Treasurer*, 469 Mich 516, 519; 676 NW2d 207 (2004), quoting *In re MCI Telecom Complaint*, 460 Mich 396, 411; 596 NW2d 164 (1999). Fundamentally, "[t]his task begins by examining the language of the statute itself. The words of a statute provide the most reliable evidence of [the Legislature's] intent . . . ." *Sun Valley*, 460 Mich at 236 (citation and quotation marks omitted). This Court must "consider both the plain meaning of the critical word or phrase as well as 'its placement and purpose in the statutory scheme.'" *Id*. at 237, quoting *Bailey v United States*, 516 US 137,

10

145; 116 S Ct 501; 133 L Ed 2d 472 (1995). "As far as possible, effect should be given to every phrase, clause, and word in the statute. The statutory language must be read and understood in its grammatical context, unless it is clear that something different was intended." *Sun Valley*, 460 Mich at 237.

In interpreting § 3104, this Court first must determine how § 3104(2) corresponds with § 3107 and how these two provisions correspond within the entire statutory scheme. Section 3104(2) requires that the MCCA "shall provide and each member shall accept indemnification for 100% of the amount of ultimate loss sustained under personal protection insurance coverages in excess of the following amounts in each loss occurrence . . . ."[13] Section 3107(1)(a) defines "personal protection insurance *benefits*" as "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery or rehabilitation." This provision requires that all PIP benefits claimed and paid between the insurer and the insured must be reasonable. The MCCA argues that this Court should incorporate the § 3107 definition of "benefits" into § 3104(2) where § 3104(2) refers to "coverages." However, we decline to do so because the phrase "personal protection insurance *benefits*" has a distinct meaning from the phrase "personal protection insurance *coverages*" that is found in § 3104(2).

---

[13] The amounts are statutorily set to increase over time. At the time of both accidents, the threshold amount was $250,000. In 2008, the threshold amount was $440,000. See MCL 500.3104(2)(a)-(k).

11

When the Legislature uses different words, the words are generally intended to connote different meanings. Simply put, "the use of different terms within similar statutes generally implies that different meanings were intended." 2A Singer & Singer, Sutherland Statutory Construction, (7th ed), § 46:6, p 252. If the Legislature had intended the same meaning in both statutory provisions, it would have used the same word. Therefore, we disagree with the MCCA and hold that the definition of personal protection insurance *benefits* found in § 3107(1)(a) (including the reasonableness standard) is not equivalent to the definition of personal protection insurance *coverages* in § 3104(2).

The distinctive use of the term "coverages" is important. *LeBlanc v State Farm Mut Auto Ins Co*, 410 Mich 173, 204; 301 NW2d 775 (1981) ("'Coverage', a word of precise meaning in the insurance industry, refers to protection afforded by an insurance policy, or the sum of the risks assumed by a policy of insurance."). Although the terms "benefits" and "coverages" are related because of their close proximity in the statute,[14] the proximity of these two terms does not mean that they are synonymous.

---

[14] MCL 500.3107(1) provides, in pertinent part:

> Except as provided in subsection (2), personal protection insurance *benefits* are payable for the following:

> (a) Allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation. Allowable expenses within personal protection insurance *coverage* shall not include charges for a hospital room in

12

Section 3107 excludes from the definition of "allowable expenses" within PIP "coverages" hospital charges in excess of reasonable and customary semi-private room charges and funeral and burial expenses in amounts specified in the policy (subject to a range specified in that section).  This leaves all other charges open to PIP "coverage."  The fact that the Legislature limited the exceptions to "coverage" so narrowly indicates that the term "coverage" is a broader term than "benefits."  Moreover, because "coverages" is never given a more restrictive definition elsewhere in the statute, the word must be afforded its ordinary, everyday meaning.  *Sun Valley*, 460 Mich at 237 ("The statutory language must be read and understood in its grammatical context, unless it is clear that something different was intended.").  In the grammatical context, the meaning of "coverages" is its common meaning, limited only by the specific statutory exceptions.

"Coverage" is defined in dictionaries as the "[e]xtent of protection afforded by an insurance policy [or the] amount of funds reserved to meet liabilities,"[15] as "protection against a risk or risks specified in an insurance policy,"[16] as "the risks

---

excess of a reasonable and customary charge for semiprivate accommodations . . . or for funeral and burial expenses in the amount set forth in the policy which shall not be less than $1,750.00 or more than $5,000.00.  [Emphasis added.]

[15] *Webster's II New College Dictionary* (1995).

[16] *Random House Webster's Dictionary* (2001).

13

within the scope of an insurance policy,"[17] and as the "amount, and extent of risk covered by insurer."[18] Under the common meaning of "coverage," the contractual liability amount that an insurer agrees to pay an insured is considered a part of the insurer's coverage. USF&G and Hartford paid funds pursuant to a consent judgment and a settlement agreement with the respective insureds. This contractual liability, or coverage, owed by each insurer is the total amount agreed to between the original contracting parties. The reasonableness of the agreed payment amount is not a factor.

The meaning of "coverages" in MCL 500.3107 becomes clearer after considering "'its placement and purpose in the statutory scheme.'" *Sun Valley*, 460 Mich at 236, quoting *Bailey*, 516 US at 145. In the statute, "coverages" is positioned just after "ultimate loss." "Ultimate loss" is statutorily defined as the "actual loss amounts that a member is *obligated* to pay and that are paid or payable by the member . . . ." MCL 500.3104(25)(c) (emphasis added). The obligation of the insurer is to fulfill its duty by honoring its contractual coverages. The duty to perform the contract relates back to the ultimate loss insofar as the ultimate loss includes payment of the obligation, i.e., the total contracted amount. Consequently, the MCCA must reimburse the insurers for 100 percent of the ultimate loss, which reflects the amount to which the insurer and the insured agreed, and subject to PIP coverage. The ultimate loss specifically refers to

---

[17] Black's Law Dictionary (7th ed).

[18] Black's Law Dictionary (5th ed).

14

coverage, which is broader than benefits and is not statutorily limited to reasonable payments.[19]

Moreover, the MCCA is not a no-fault insurer of its member companies, and the member companies are not injured persons entitled to no-fault indemnification. Thus, the relationship between the MCCA and its members is not subject to the reasonableness requirements found in MCL 500.3107. Rather, the Legislature provided in § 3104(2) that the MCCA would "indemnify" the insuring members for PIP payments. The Legislature did not state that the MCCA would "insure" or "reinsure" the members for amounts greater than the threshold. Black's Law Dictionary (5th ed) defines "indemnify" as "[t]o restore the victim of a loss, in whole or in part, by payment . . . ; to secure against loss or damage . . . ." Indemnification is not a contingent plan like an insurance plan. Instead, it is a set security meant to assist against certain circumstances. Here, those circumstances arise when the PIP amount contracted by the insurer exceeds the statutory threshold.

Section 3401(1) states that the MCCA is "not subject to any laws . . . with respect to insurers." Thus, the MCCA is not a no-fault insurer, and consequently

_____

[19] The MCCA argues that if there is not a reasonableness factor for it to enforce, the member insurers will have no incentive to make reasonable settlements that do not exceed the statutory threshold amount because the insurers will not be liable to pay anything beyond the threshold amount. However, one incentive comes from higher premiums paid to the MCCA. See MCL 500.3104(7)(d) (requiring that the MCCA assess its member companies an annual premium on each of their no-fault policies written in Michigan). If all the individual members act in a manner that does not regard the reasonableness of their settlements, then insurance premiums will increase greatly.

it is also not a reinsurer. Because the MCCA is not a no-fault insurer, but, rather, an indemnitor of no-fault insurers for benefits in excess of the statutory threshold, § 3107 does not directly bind the MCCA; it only binds the insurer members and the insured. Section 3107 "makes both reasonableness and necessity explicit and necessary elements of a *claimant's* [insured's] recovery . . . ." *Nasser v Auto Club Ins Ass'n*, 435 Mich 33, 49; 457 NW2d 637 (1990) (emphasis added). Specifically, it is the insurance company that has the right to deny a claim (or part of a claim) for unreasonableness under § 3107. The *insured* then has the burden to prove that the charges are in fact reasonable. See generally *Nasser*, 435 Mich 33, *Manley v Detroit Automobile Inter-Ins Exch*, 425 Mich 140; 388 NW2d 216 (1986), and *LaMothe v Auto Club Ins Ass'n*, 214 Mich App 577; 543 NW2d 42 (1995). Given that the established burden of proof is on the insured, it is counterintuitive to conclude that the member insurance company would benefit from not having the burden of proof in one instance against an insured, but having the burden in another instance against the MCCA.

The MCCA maintains that the foregoing statutory constructions will lead to higher costs to insureds and will be a disincentive for member insurers to keep payments reasonable. These fears are unfounded. The MCCA is an unincorporated nonprofit association, whose purpose is to provide insurers with indemnification for PIP policies that exceed a certain threshold. See MCL 500.3104(1). The Legislature created the MCCA "in response to concerns that Michigan's no-fault law provision for unlimited [PIP] benefits placed too great a

16

burden on insurers, particularly small insurers, in the event of 'catastrophic' injury claims." *In re Certified Question*, 433 Mich at 714. The MCCA maintains that it should have the ability to unilaterally stop making indemnification payments to a member when it determines that the claim payments are unreasonable. Yet, the MCCA acknowledges that a member can take the MCCA to court over a reasonableness dispute, which would leave a finder of fact as the ultimate authority over whether the payments are reasonable.

In essence, under the MCCA's preferred outcome, when a member insurer makes an agreement with an insured (often in a litigation setting, whether it be an arbitration hearing, consent judgment, or declaratory judgment), the member must then sue the MCCA if the MCCA finds that the payment is unreasonable. If this Court were to accept the MCCA's argument, the logical consequence would be that member insurers would be reluctant to settle with the claimant. Member insurers might then force a jury trial with every catastrophically injured claimant in order to secure a verdict with a "reasonable" stamp on the result. This outcome goes against the legislative purpose of assuring efficient and quick recovery for claimants in the no-fault system. *Shavers v Attorney General*, 402 Mich 554, 578-579; 267 NW2d 72 (1978) ("The goal of the no-fault insurance system was to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain economic losses.").

In response to the MCCA's concerns, it should be pointed out that the MCCA is not without a safeguard to protect against unreasonable payments. The

Legislature specifically laid out powers that the MCCA can exercise to guard against unreasonable settlements of catastrophic claims. MCL 500.3104(7)(b) states that the MCCA shall

> [e]stablish procedures by which members shall promptly report to the association each claim that, on the basis of the injuries or damages sustained, may reasonably be anticipated to involve the association if the member is ultimately held legally liable for the injuries or damages. Solely for the purpose of reporting claims, *the member shall in all instances consider itself legally liable for the injuries or damages*. The member shall also advise the association of subsequent developments likely to materially affect the interest of the association in the claim. [Emphasis added.][20]

This statutory language requires and empowers the MCCA to establish procedures to protect itself from unreasonable settlements in all cases involving claims that may exceed the threshold and consequently affect the MCCA. The MCCA's plan of operation likewise echoes these statutory requirements.[21] This language enables the MCCA to establish procedures that will enable it to exercise appropriate control over settlements whenever the member reasonably anticipates that the claim will involve the MCCA.

---

[20] Section 3104 includes numerous other rules for the MCCA, such as membership requirements, liability, and creation of a "plan of operation."

[21] Art X, § 10.01 of the plan of operation provides in part:

> Members shall report to the Association such information as the Board may require on forms prescribed by the Board: (a) As soon as practicable after the loss occurrence, Members shall report each claim which, on the basis of the injuries or damages sustained, may reasonably be anticipated to result in a Reimbursable Ultimate Loss, and for purposes of reporting the Member shall consider itself legally liable for the injuries and damages.

18

Only then, not after the claimant and member insurer have reached a settlement, can the MCCA exercise control over the settlement process. Under MCL 500.3104(7)(g), the MCCA must

> [e]stablish procedures for reviewing claims procedures and practices of members of the association. *If the claims procedures or practices of a member are considered inadequate to properly service the liabilities of the association, the association may undertake* or may contract with another person, including another member, *to adjust or assist in the adjustment of claims* for the member on claims that create a potential liability to the association and may charge the cost of the adjustment to the member. [Emphasis added.]

Thus, when § 3104(7)(g) is read in conjunction with § 3104(7)(b), the outcome is that the MCCA is required to review those reports by members that anticipate needing indemnification and to assess the adequacy of the *procedures or practices* of the member. [22] Upon a finding of inadequacy, the MCCA can adjust the *practices or procedures* of the member.[23] One of the key protections here is that

---

[22] The MCCA argued that because part of § 3104(7)(g) uses the term "may" instead of "must" in describing some of its potential powers, the MCCA has greater power than what directly follows in the statute to limit or control the individual member insurers. The MCCA wishes to conclude that since the section does not set forth a duty to act in a specific way (e.g., review claims), it allows the MCCA to act how *it* wants regarding member claims, including questioning their reasonableness. This is erroneous. The premise and purpose of the MCCA is to indemnify insurers for payments beyond the threshold amount, so that insurance firms of all sizes can compete in Michigan's no-fault market without fear of sustaining disproportionate catastrophic loss claims.

[23] The plan of operation also echoes the statute in this regard:

> If a Member or 3103 Member refuses to timely submit the reports or information required of it pursuant to Section 10.01 or otherwise, or if the Board should determine that the reports and information submitted by a Member or 3103 Member are unreliable or incomplete, the Board may, at the member's expense, direct that an authorized representative of the Association (which may be

19

the MCCA has the power and duty to adjust *only* "procedures and practices" of the member that produce an unreasonable payment amount; the power does not include the power to adjust the amount after a settlement has been reached.[24] The MCCA has the power to step in before a settlement has been reached and adjust situations that it anticipates might otherwise expose it to unreasonable indemnification costs. By requiring submission of proposed settlement agreements for approval, the MCCA can protect itself against later having to pay unreasonable claims from member insurers. The exercise of these powers is the MCCA's protection against a member's neglect of its duties.

Finally, the MCCA argues that § 3104(8)(g) gives it the power to question reasonableness regardless of the statute's other provisions. Specifically, § 3104(8)(g) allows the MCCA to "[p]erform other acts not specifically enumerated in this section that are necessary or proper to accomplish the purposes of the association and that are not inconsistent with this section or the plan of operation."

---

another member) shall audit and inspect such member's records and compile the required information and data. [Art X, § 10.02.]

[24] Although § 3104(7)(g) states that the MCCA may "adjust or assist in the adjustment of claims," the practical effect of § 3104(7)(g) is that only the MCCA is able to prescribe procedures and practices by which to ensure the reasonableness of the amounts that members agree to pay to claimants. When the MCCA asserts its power to adjust or assist in the adjustment of a claim, the MCCA effectively steps into the shoes of the member insurer. The claim that the MCCA reviews for adjustment purposes is the insured's claim with the member insurer, not the member insurer's reimbursement claim with the MCCA. Accordingly, the MCCA, standing in the shoes of the member insurer, is limited to the member insurer's power to review the insured's claim for reasonableness as spelled out in the member insurer's policy, a settlement agreement, or a consent judgment. Thus, even when the MCCA assists in or assumes control over the claims adjustment process, the amount payable is still dictated by the amount that the member insurer is "obligated" to pay to the insured when a settlement already has been reached.

20

However, this section does not give the MCCA carte blanche to simply avoid a member insurer's agreement that it finds unreasonable. The power granted under § 3104(8)(g) is limited to accomplishing the "purposes of the association." More importantly, the exercise of this power cannot be "inconsistent with this section or the plan of operation." *Id*. The plan of operation created pursuant to § 3104(17) must be "*consistent* with the objectives and provisions of this section, which shall provide for the economical, fair, and nondiscriminatory administration of the association *and for the prompt and efficient provision of indemnity*." MCL 500.3104(17) (emphasis added).

Section 3104(8)(g) allows the MCCA to fulfill the specific requirements of the statute. Accordingly, we interpret § 3104(8)(g) as granting the MCCA the limited power to further its purpose of prompt and efficient indemnification of its members. To interpret that section as granting any further power, such as the power to decline indemnification on the basis of the reasonableness of the indemnification amount, would be inconsistent with the Legislature's intent.

## IV. Response to the Dissent

The dissent raises the concern that a decision in favor of plaintiffs in this case will result in substantially increased insurance costs. Certainly, insurance costs are a critical concern, but they are a policy concern that belongs to the Legislature. Nonetheless, we observe that the concern appears highly speculative and, indeed, unfounded. There is no evidence that insurers have engaged or will

21

engage in slack negotiations. It bears mentioning here that there is no indication that the settlements in these cases were unreasonable when made.

The dissent bases its concern on an affidavit from defendant's executive director in which she refers to an estimate provided by consultants to defendant. No basis is given in the affidavit for the estimated increase in costs. And there is reason to wonder about this estimate, at least inasmuch as it might be based on an anticipated decision from this Court.

First, there is no evidence that defendant has routinely or even occasionally challenged the reasonableness of insurers' settlements with their insureds until very recently. It is difficult to understand how it will cost defendant extravagant sums to give up a practice it has only recently begun. Second, it is unknown whether the actuarial assessment factored in the effect of defendant's potential use of the cost-containment procedure actually provided by the Legislature in MCL 500.3104(7)(g).

As mentioned, the Legislature has provided that "[i]f the claims procedures or practices of a member are considered inadequate to properly service the liabilities of the association, the association may undertake . . . to adjust or assist in the adjustment of claims for the member on claims that create a potential liability to the association . . . ." MCL 500.3104(7)(g). There is no evidence that the actuarial assessment considered the effect of defendant's implementation of this legislatively provided cost-savings mechanism.

22

The dissent additionally fails to recognize that there is a compelling policy reason to reject defendant's claim that it may review settlements for reasonableness: namely, to limit litigation and promote settlements. This Court has long recognized that "[t]he goal of the no-fault insurance system was to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain economic losses." *Nelson v Transamerica Ins Services*, 441 Mich 508, 514; 495 NW2d 370 (1992) (citation and quotation marks omitted). Additionally, this Court has stated that "[t]he act is designed to minimize administrative delays and factual disputes that would interfere with achievement of the goal of expeditious compensation of damages suffered in motor vehicle accidents." *Miller v State Farm Mut Auto Ins Co*, 410 Mich 538, 568; 302 NW2d 537 (1981). The ability of insurers to settle claims is essential to meeting these goals. Yet, if defendant can reexamine settlements of reasonableness long after they are made, then insurers will be very reluctant to make settlements. Further, a new layer of litigation for after-the-fact reasonableness assessments, such as this one, would be inevitable. There is no evidence that the actuarial assessment on which the dissent relies has accounted for the substantial increase in litigation costs that would result if this Court allows defendant the extra-statutory power to question settlements for reasonableness after they are made.

But, again, these are policy concerns best addressed by the Legislature. It appears that the Legislature has indeed balanced these concerns in the provisions of MCL 500.3104, and there is no reason for this Court to apply a strained

23

construction to the statutes to achieve a goal contrary to the purposes of the no-fault act. In the unlikely event that insurers become milquetoast negotiators, defendant has the statutorily provided protection to remedy the situation.

## V. Conclusion

We hold that the indemnification obligation set forth in § 3104(2) does not incorporate the reasonableness standard that § 3107 requires between claimants and member insurers. Furthermore, the powers granted to the MCCA in § 3104(7) are limited to adjusting the "practices and procedures" of the member insurers and do not encompass adjustment to the payment amount agreed to between claimants and member insurers. Finally, we hold that the power granted to the MCCA under § 3104(8)(g) is limited to furthering the purposes of the MCCA, and that determining reasonableness is not one of its purposes.

Accordingly, we affirm the Court of Appeals holding that the MCCA must reimburse its member insurers 100 percent of the ultimate loss exceeding the statutory threshold for claims without a reduction based on its unilateral assessment of the reasonableness of the amount.

Affirmed.

Elizabeth A. Weaver
Marilyn Kelly
Michael F. Cavanagh
Diane M. Hathaway

24

STATE OF MICHIGAN

SUPREME COURT

UNITED STATES FIDELITY INSURANCE &
GUARANTY COMPANY,

    Plaintiff-Appellee,

v                                        No. 133466

MICHIGAN CATASTROPHIC CLAIMS
ASSOCIATION,

    Defendant-Appellant,

and

MICHAEL MIGDAL, Individually and as
Conservator for the Estate of DANIEL MIGDAL,
a Protected Person,

    Defendant.

_____

HARTFORD INSURANCE COMPANY OF THE
MIDWEST,

    Plaintiff-Appellee,

v                                        No. 133468

MICHIGAN CATASTROPHIC CLAIMS
ASSOCIATION,

    Defendant-Appellant.

_____

YOUNG, J. (*dissenting*).

    I respectfully dissent.

On December 29, 2008, this Court decided these cases.[1] Today, just a few months later, a new majority[2] reverses that decision and it does so without even affording the parties an opportunity to brief and argue why this reversal is warranted. Although not relevant to my analysis of the substantive issue in these cases,[3] the costs that the majority's decision will impose on Michigan drivers is relevant to assessing the majority's hurried approach and policy-based reversal of this Court's prior decision. As I will discuss later, the majority's decision will cause every Michigan resident who owns and insures an automobile to pay a 19 percent higher annual surcharge premium for mandatory catastrophic coverage. The cost of the majority's decision to those with insured automobiles will be an estimated $693.8 million more for the coming year alone.[4]

## I. What Changed?

The facts have not changed. The text of the statute at issue has not changed. The parties' arguments have not changed. And the rationale advanced in the opinions of this Court has not changed. Yet, within a matter of months, a

---

[1] *United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n*, 482 Mich 414; 759 NW2d 154 (2008) (hereinafter *USF&G I*).

[2] I note that the majority in this case is the new philosophically aligned majority: Justices Weaver, Cavanagh, Hathaway, and Chief Justice Kelly.

[3] See *USF&G I*, *supra* at 432 n 32.

[4] In response to the motions for rehearing, the Michigan Catastrophic Claims Association (MCCA) has conducted an actuarial assessment to detail the expected increase in auto insurance premiums that reversal of our original decision will produce—19 percent more in catastrophic claims premiums to be precise. See the affidavit of Gloria Freeland in support of appellant's supplement to its answer to appellee's motion for rehearing, attached hereto as an appendix.

2

decision of this Court, thoughtfully briefed, argued, and considered by seven justices, is no longer worth the paper it was written on. Even the casual observer, however, does not really need to ask why. The reason is obvious: On January 1, 2009, the composition of this Court changed.

## II. Why is this Case being Reheard?

This case was argued on October 1, 2008. On November 4, 2008, Justice Hathaway defeated then-Chief Justice Taylor in the election for his seat on this Court. This case was decided on December 29, 2008, with former Chief Justice Taylor casting his vote with the majority.

The new majority's opinion today offers no new rationale or argument. In fact, it is merely an extended quotation of Justice Weaver's former dissent.

For over a century this Court has adhered to the principle that a motion for rehearing should be denied *unless* a party has raised an issue of fact or law that was not previously considered but which may affect the outcome.[5] Indeed, this Court codified that principle in our court rules.[6]

---

[5] See *Nichols, Shepard & Co v Marsh*, 62 Mich 439, 440; 29 NW 37 (1886); *Thompson v Jarvis*, 40 Mich 526, 526 (1879).

[6] See MCR 2.119(F)(3), which provides:

Generally, and without restricting the discretion of the court, a motion for rehearing or reconsideration which merely presents the same issues ruled on by the court, either expressly or by reasonable implication, will not be granted. The moving party must demonstrate a palpable error by which the court and the parties have been misled and show that a different disposition of the motion must result from correction of the error.

3

As Justice Weaver's former dissent in these cases and the majority's new opinion make obvious, the parties have not raised a new issue of fact or law to merit rehearing. The only difference is in the membership of this Court. As early as 1883, this Court had the wisdom to realize that such a change is not a proper ground for rehearing. In *Peoples v Evening News Ass'n*,[7] this Court's opinion on a motion for rehearing stated in its entirety:

> This case having been heard and decided when three judges only were sitting, and a change in the Court having taken place and a further change being [about] to occur on the first of January, a motion is now made for a rehearing at the next January term before the full Court as it will then be constituted.

> *Held*, unanimously, that a rehearing will not be ordered on the ground merely that a change of members of the bench has either taken place or is about to occur.[8]

By ordering rehearing simply because a change in the Court has taken place, the new majority has overruled the longstanding and clear principle of *Peoples*.[9] Will

---

The new majority states that MCR 2.119(F)(3) "creates a 'palpable error' standard for rehearing cases." *Ante* at 9 n 12. The actual standard created is: "a palpable error *by which the court and the parties have been misled* . . . ." Neither the parties nor the new majority suggest that this Court was previously misled. Plaintiffs and the new majority simply disagree with this Court's prior opinion for the reasons previously stated in the flawed analysis of Justice Weaver's dissent.

[7] 51 Mich 11; 16 NW 185 (1883).

[8] *Id*. at 21.

[9] The restraint demonstrated by this Court in *Peoples* has been duplicated by other courts denying rehearing when the sole basis is a change in the composition of the court. See *Golden Valley Co v Greengard's Estate*, 69 ND 171, 190; 284 NW 423 (1938); *Gas Products Co v Rankin*, 63 Mont 372; 207 P 993 (1922); *Wolbol v Steinhoff*, 25 Wyo 227, 258; 170 P 381 (1918); *Woodbury v Dorman*, 15 Minn 341 (1870); *Stearns v Hemmens*, 3 NYS 16 (NY Comm Pl, 1888).

4

any change in an assigned judge now justify the reopening of a predecessor's ruling?

It is apparent that the new majority feels unencumbered by such principles—even one that has endured for more than 100 years. And, perhaps, its members no longer feel a need to be cosseted by the concerns and beliefs that they professed to have for the past decade when they were members of the philosophical minority of this Court. Indeed, Chief Justice Kelly once exclaimed that a recent decision of the Court being reconsidered "has hardly had time to become outmoded."[10] Justice Cavanagh similarly protested that "[i]f a majority of the Court believes that reconsideration should be granted, then I believe that the *proper* course would be to receive briefs and hear arguments on the defendant's constitutional argument before remanding the case to the trial court."[11]

---

[10] *McCready v Hoffius*, 459 Mich 1235, 1236 (1999) (Kelly, J., dissenting).

[11] *Id.* at 1236-1237 (Cavanagh, J., dissenting) (emphasis added). Unlike this case, the defendants in *McCready* cited new authority for their position. Nevertheless, Chief Justice Kelly and Justice Cavanagh were adamant that this Court erred by considering the new authority on rehearing. It is indeed *at least* curious that Chief Justice Kelly and Justice Cavanagh opposed the remand order in *McCready*, which was premised on *new* authority, but freely joined this Court's order for rehearing "without further briefing or oral argument," *United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n*, 483 Mich 913 (2009), and the reversal of this Court's opinion without any new issues being raised.

Moreover, I find it odd that Justice Hathaway, who, during her Supreme Court campaign, actively promoted the fabrication that former Chief Justice Taylor slept through the oral argument of *McDowell v Detroit*, 477 Mich 1079 (2007), finds it appropriate to cast her vote to overturn this Court's decision without so much as attending argument on this case or allowing the party opposing the motion to have its day in court. See minutes 4:28 to 4:40 at <http://www.youtube.com/watch?v=_7woWJDk1Qg> (accessed June 3, 2009).

Because nothing in the facts, arguments, or legal rationale has changed, I continue to support this Court's original decision and do not feel the need to restate it in its entirety here.

### III. Facts and Procedural History

The facts and procedural history of these consolidated appeals are simple, uncontested, and have been set out by this Court in detail three times.

The central question here is whether an insurance company that strikes a bad bargain with its insured may fob off on the Michigan Catastrophic Claims Association (MCCA), a nonprofit entity created by the Legislature to spread the costs associated with catastrophic automobile injuries, these "unreasonable" expenses. In our earlier decision, we held that the MCCA had explicit statutory authority to resist assuming responsibility for an insurance company's *unreasonable* payouts.

Plaintiff United States Fidelity Insurance & Guaranty Company (USF&G) entered into a consent judgment with its insured, Daniel Migdal, which resulted in USF&G paying $54.84 an hour for attendant care services.[12] Plaintiff Hartford

---

[12] The debate here is not whether an insurance company may refuse to fully compensate a catastrophically injured insured. Indeed, the plaintiff insurance companies were required to fully compensate their insureds under *USF&G I.* The question is whether an insurance company can agree to *overcompensate* its insured and escape this burden by having the rest of Michigan policyholders pay for that bad bargain. This very issue is well illustrated by the facts of *USF&G* itself.

The rate that USF&G pays its insured, Daniel Migdal, to cover costs associated with his catastrophic injuries is so inflated that his father (Daniel's "caregiver") started a company, Medical Management, to make a profit from the arrangement. From the $54.84 hourly payments that USF&G makes, Medical

Insurance Company of the Midwest (Hartford) entered into a settlement agreement with its insured, Robert Allen, which required that Hartford pay $30 an hour for attendant care services. The MCCA refused to indemnify USF&G and Hartford beyond a rate of $22.05 and $20 respectively, rejecting the higher amounts as "unreasonable."

Plaintiffs brought these actions seeking declaratory judgments that the MCCA was required to reimburse the full rate of attendant care services that they paid their insureds. The circuit courts entered conflicting judgments and the aggrieved parties appealed. The Court of Appeals consolidated the appeals and held that "the MCCA is statutorily required to reimburse an insurer for 100 percent of the amount that the insurer paid in PIP [personal protection insurance] benefits to an insured in excess of the statutory threshold listed in MCL 500.3104(2), regardless of the reasonableness of these payments."[13] The MCCA sought leave to appeal in this Court, which was granted, and this Court held that "when a member insurer's policy only provides coverage for 'reasonable charges,' the MCCA has authority to refuse to indemnify unreasonable charges."[14]

---

Management pays the nurses (who actually provide Daniel's care) an average of $32 an hour (*including benefits!*) and retains the remainder of the USF&G hourly payment for itself. So inflated was the USF&G payment that, after paying for *all* of Daniel's care, Medical Management earned from this arrangement approximately $200,000 *in profits* for 2003. Under the majority's new opinion, it will be *Michigan policyholders*, not USF&G, who will pay for the profits of Daniel's father.

[13] *United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n*, 274 Mich App 184, 192; 731 NW2d 481 (2007).

[14] *USF&G I*, *supra* at 417.

7

*Because* the composition of this Court changed on January 1, 2009, USF&G and Hartford sought rehearing[15] and the new majority granted this motion "without further briefing or oral argument."[16]

## IV. Discussion

As previously noted, at issue is whether the MCCA has the authority to refuse to indemnify member insurers for unreasonable payments they make to their policyholders. I agree with many points of the majority's new opinion, but the points of my disagreement are significant and the results of our differences will be extremely costly to the citizens of Michigan.

I agree that "personal protection insurance benefits" are not the same as "personal protection insurance coverages."[17] I further agree that "the term 'coverage' is a broader term than 'benefits.'"[18] I particularly agree with each of the definitions for "coverages" cited by the new majority.[19] "'[C]overage' refers

---

[15] In its reply brief filed February 19, 2009, USF&G argued that "this Court's practice of granting rehearing requests based on nothing more than a view of a majority of the Justices that the Court's original opinion is incorrect . . . is as it should be, given this Court's status as a court of last resort." This statement both ignores *Peoples* and betrays the plaintiffs' motivation for seeking rehearing.

[16] *United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n*, 483 Mich 913 (2009).

[17] *Ante* at 11. Justice Weaver asserts that "the terms 'benefits' and 'coverages' are related because of their close proximity in the statute." *Ante* at 12. I am unfamiliar with this tenet of statutory construction, and Justice Weaver offers no authority for it. Indeed, whether separated by two words or two hundred, I believe that the meaning of benefits and coverages are related, but distinct.

[18] *Ante* at 13.

[19] *Ante* at 12, quoting *LeBlanc v State Farm Mut Auto Ins Co*, 410 Mich 173, 204; 301 NW2d 775 (1981), for the proposition that "'[c]overage', a word of

8

to protection afforded by an insurance *policy* or the sum of risks assumed by an insurance *policy*."[20]  I disagree, however, with the new majority's refusal to interpret "coverages" consistent with the definitions that it cites—a reference to the underlying insurance policy.

The majority states its holding: "the indemnification obligation set forth in MCL 500.3104(2) does not incorporate the reasonableness standard that MCL 500.3107 requires between claimants and member insurers."[21]  That is true but unresponsive to this Court's holding in *USF&G I*.  This Court did not previously incorporate the § 3107 standard for personal protection insurance (PIP) benefits into § 3104(2).  Rather, this Court, consistent with the definitions advanced by the majority, interpreted "coverages" as the "protection afforded by an insurance *policy*" and explained that "the member insurer's *policy* will ultimately control the

---

precise meaning in the insurance industry, refers to protection afforded by an insurance policy, or the sum of the risks assumed by a policy of insurance."  The new majority also cites the following consistent definitions: (1) the "[e]xtent of protection afforded by an insurance policy [or the] amount of funds reserved to meet liabilities"; (2) "protection against a risk or risks specified in an insurance policy"; (3) "the risks within the scope of an insurance policy"; and (4) the "amount, and extent of risk covered by insurer."  *Ante* at 13-14, quoting *Webster's II New College Dictionary* (1995); *Random House Webster's Dictionary* (2001); Black's Law Dictionary (7th ed); and Black's Law Dictionary (5th ed).  See *USF&G I*, *supra* at 431 n 31.

[20] *USF&G I*, *supra* at 431 n 31 (emphasis added), quoting *Jarrad v Integon Nat'l Ins Co*, 472 Mich 207, 217; 696 NW2d 621 (2005).

[21] *Ante* at 2, 24.

standard for the MCCA's review because the *policy* establishes the 'personal protection insurance coverages.'"[22]

Referring to the consent judgment and settlement agreement at issue, the new majority contends that "[t]his contractual liability, *or coverage*, owed by each insurer is the total amount agreed to between the original contracting parties."[23] The fallacy in this assertion is that the consent judgment or settlement agreement is "coverage." As amply demonstrated by the definitions that the majority cites, "coverage" refers to the underlying *policy* purchased by the insured. That *policy* is the only relevant contract. The consent judgment and settlement agreement are separate contractual, albeit judicially sanctioned, agreements. They are distinctly *not* "the no-fault personal protection insurance coverages that are generally the subject of the act, i.e., those which were written in this state to provide the compulsory security requirements of § 3101(1) of the no-fault act for the 'owner

---

[22] *USF&G I*, *supra* at 430-431; *id.* at 431 n 31 ("Thus, the terms of the *policy* control the standard for the MCCA's review."). This fundamental distinction was underscored by Justice Markman in his concurrence:

> The dissent is correct that the reasonableness requirement of MCL 500.3107 is not integrated into the indemnification clause set forth in § 3104(2). [*USF&G I*, *supra*] at 457 [(Weaver, J., dissenting)]. However, the majority opinion does not attempt to incorporate this requirement into the MCCA's statutory power to review a member insurer's claim to ensure it is in compliance with the policy. Rather, it holds that the MCCA can review a member's claim for compliance *with the policy*, which, as represented by both parties, generally includes a requirement that member insurers reimburse only *reasonable* claims based on § 3107. [*USF&G I*, *supra* at 434 n 1 (Markman, J., concurring).]

[23] *Ante* at 14 (emphasis added).

10

or registrant of a motor vehicle required to be registered in this state' . . . ."[24]

Because the majority offers no principled rationale for departing from the definitions that it cites or this Court's prior interpretation of "personal protection insurance coverages," I must respectfully dissent.

The majority makes additional erroneous assertions. First, the majority asserts that member insurers will have an incentive to make reasonable settlements of catastrophic claims because, if they do not, the MCCA premiums will increase.[25] The majority appears unaware of how incentives, or the MCCA, work. The premium that the MCCA charges to cover the liabilities it must statutorily assume is evenly distributed among the member insurers[26] and then passed on to

---

[24] *In re Certified Question (Preferred Risk Mut Ins Co v Michigan Catastrophic Claims Ass'n)*, 433 Mich 710, 723; 449 NW2d 660 (1989). See also *USF&G I, supra* at 437-439 (Markman, J., concurring) (explaining that the consent judgment and settlement agreement are not part of the member insurer's "coverages" because "[a] member insurer that informs the MCCA that it will only pay 'reasonable' claims, but then subsequently modifies the policy after the accident occurs to include unreasonable claims, has essentially sought reimbursement for claims for which it has not paid premiums").

[25] *Ante* at 15 n 19.

[26] See MCL 500.3104(7)(d), which provides in pertinent part:

Each member shall be charged an amount equal to that member's total written car years of insurance providing the security required by [MCL 500.3101(1)] or [MCL 500.3103(1)], or both, written in this state during the period to which the premium applies, multiplied by the average premium per car. The average premium per car shall be the total premium calculated divided by the total written car years of insurance providing the security required by section 3101(1) or 3103(1) written in this state of all members during the period to which the premium applies.

those who buy no-fault insurance.[27]  Indeed, this Court has been informed that in *response to the order granting rehearing in this case*, the MCCA raised its rates by 19 percent per policy (or $693.8 million more per MCCA assessment in the aggregate for this year) to create the reserves necessary to pay the more expansive claims for unreasonable charges that the new majority's opinion permits.  Contrary to the new majority's belief that an insurer will have an economic incentive to bargain for "reasonable" payments to its insureds, the majority opinion will have the perverse effect of eliminating an insurer's incentive to negotiate reasonable settlements.  Indeed, instead of providing insurers a protective shield against unreasonable catastrophic claims, the majority opinion provides plaintiffs' no-fault attorneys a lethal sword against an insurer that insists on a reasonable settlement.  MCL 500.3148(1) provides that a claimant's attorney fee is charged to the insurer "if the court finds that the insurer unreasonably refused to pay the claim or unreasonably delayed in making proper payment."  Under the majority's decision, an insurer has no reason to refuse any claim; thus, a claimant's attorney can use the threat of attorney fees to force an insurer into an unreasonable settlement.[28]

---

[27] See *USF&G I*, *supra* at 432 n 32; *In re Certified Question*, *supra* at 729 (explaining that the MCCA premiums are "inevitably" "passed on" to Michigan's no-fault insurance customers); MCL 500.3104(22), which provides that "[p]remiums charged members by the association shall be recognized in the rate-making procedures for insurance rates in the same manner that expenses and premium taxes are recognized."

[28] The MCCA provided a useful hypothetical conversation between a future plaintiff's no-fault attorney and an insurer:

Under the majority's decision, insurers will be encouraged to negotiate *un*reasonable settlements and pass these off onto the MCCA. As stated, any liability that the MCCA must assume is eventually passed on to anyone in Michigan who must buy auto insurance.

Perhaps the majority can explain why the legislative method for containing costs for Michigan's no-fault insurance customers is an inferior purpose to their preferred policy objective. In particular, why is it an inferior purpose at a time when the Governor has requested an auto insurance rate freeze[29] and unemployment in Michigan has exceeded 14 percent?[30]

My point is not that our decision should be premised on keeping no-fault insurance affordable. Indeed, I maintain that such "'[p]olicy decisions are

---

*[Attorney]*: I know that amount is a bit high for attendant care, but that is what we want. We'll sue to get it and we'll seek attorney fees and penalties too. [MCL 500.3148(1)] Do you want that?

*Insurer*: Of course not, but that amount is unreasonable.

*[Attorney]*: What does reasonable have to do with it? [The] MCCA has to pay you regardless. Do you want to incur three times that amount in attorney fees instead?

*Insurer*: Of course not.

[29] See Executive Directive No. 2009-1.

[30] See Louis Aguilar, *Michigan's jobless rate 14.1%, highest since '83*, The Detroit News, June 18, 2009, available at <://www.detnews.com/article/20090618/BIZ/906180412/1001/Michigan-jobless-rate-14.1---highest-since—83> (accessed June 28, 2009); Heather Lockwood, *State jobless rate of 14.1% is highest--since July '83*, Lansing State Journal, June 18, 2009, available at <://www.lansingstatejournal.com/article/20090618/NEWS01/906180327> (accessed June 28, 2009).

properly left for the people's elected representatives in the Legislature'"[31] and that

the Legislature *has* made the policy decision in this case. Rather, I raise this issue

because elections matter. The majority has seen fit to engage in its own policy-

making while relying on erroneous assumptions. This is a lethal combination that

will result in harmful, unintended consequences. While it may be politically

expedient to position oneself as "looking out for the little guy,"[32] this case is an

excellent example of how acting on such an altruistic impulse rather than applying

the law results in a negative consequence for the vast majority of our citizens. In

this context, each of us who must purchase this mandatory no-fault coverage is a

"little guy."[33]

Second, the majority emphasizes that the MCCA may *only* adjust a member

insurer's "practices and procedures."[34] The majority then immediately (and

---

[31] *USF&G I*, *supra* at 432 n 32, quoting *Devillers v Auto Club Ins Ass'n*, 473 Mich 562, 589; 702 NW2d 539 (2005).

[32] See, e.g., Todd C. Berg, *Hathaway attacks*, *but sketchy on incumbent's record*, Michigan Lawyers Weekly, October 7, 2008, p 14 ("The centerpiece of Hathaway's campaign against Taylor has been her claim that he rules against middle-class families and in favor of 'big insurance companies and corporate special interests.'"); Todd C. Berg, *Hathaway's campaign pledge may support MSC office closure*, Michigan Lawyers Weekly, December 15, 2008, p 1 ("Justice-elect Diane M. Hathaway ran for the Michigan Supreme Court on the platform that she would stand up for middle-class families and oppose the lavish perks and benefits that Supreme Court justices were bestowing on themselves.").

[33] The exception, of course, is the lawyer who makes a living doing no-fault insurance work. For such practitioners, the majority's opinion creates a new submarket of opportunity. See note 28 of this opinion.

[34] *Ante* at 20. See MCL 500.3104(7)(g), which provides that the MCCA shall

14

inconsistently but accurately) concedes that MCL 500.3104(7)(g) permits the MCCA to "adjust or assist in the adjustment of claims" and "[w]hen the MCCA asserts its power to adjust or assist in the adjustment of a claim, the MCCA effectively steps into the shoes of the member insurer."[35] I previously agreed with these propositions.[36] Thus, I struggle to comprehend for what purpose the majority resists the simple proposition that the MCCA is statutorily authorized to adjust claims.

Third, "[p]laintiffs argue[d] that if the MCCA may reject member insurer claims on the basis of the reasonableness of the charges, member insurers will need to seek assurances that the MCCA will reimburse certain payments before making them, thus delaying payment."[37] The prospect of delayed payment seems to be a primary concern that drives the new majority's analysis. In support of its construction, it contends:

> If this Court were to accept the MCCA's argument, the logical consequence would be that member insurers would be reluctant to settle with the claimant. Member insurers might then

---

[e]stablish procedures for reviewing claims procedures and practices of members of the association. If the claims procedures or practices of a member are considered inadequate to properly service the liabilities of the association, the association may undertake or may contract with another person, including another member, to adjust or assist in the adjustment of claims for the member on claims that create a potential liability to the association and may charge the cost of the adjustment to the member.

[35] *Ante* at 20 n 24.

[36] *USF&G I*, *supra* at 430 n 30.

[37] *Id*. at 432 n 32.

15

force a jury trial with every catastrophically injured claimant in order to secure a verdict with a "reasonable" stamp on the result.[38]

The majority employs this policy-based rationale to depart from its own definitions of "coverages" because otherwise "[t]his outcome goes against the legislative purpose of assuring efficient and quick recovery for claimants in the no-fault system."[39] The majority fails to explain, however, how its alternative construction actually resolves the issue. In fact, it does not.

The majority concedes that the MCCA *has authority to "requir[e]* submission of proposed settlement agreements for approval."[40] This is the very outcome that the plaintiff insurance companies here sought to avoid. Indeed, I believe that "requiring submission of proposed settlement agreements" or "seeking assurances that the MCCA will reimburse certain payments" would have been a natural consequence of *USF&G I*, because it actually gave meaning to the plain language of this statute. The MCCA is likely to act on the majority's advice

---

[38] *Ante* at 17.

[39] *Ante* at 17.

[40] *Ante* at 20. The majority acknowledges this authority within the context of reading MCL 500.3104(7)(g) in conjunction with § 3104(7)(b), which provides that the MCCA shall

> [e]stablish procedures by which members shall promptly report to the association each claim that, on the basis of the injuries or damages sustained, may reasonably be anticipated to involve the association if the member is ultimately held legally liable for the injuries or damages. Solely for the purpose of reporting claims, the member shall in all instances consider itself legally liable for the injuries or damages. *The member shall also advise the association of subsequent developments likely to materially affect the interest of the association in the claim.* [Emphasis added.]

16

(indeed, it *should*) and mandate that member insurers afford it the opportunity to object to proposed settlements or other agreements *before* they become binding. Ironically, it appears that even the majority does not deny that the MCCA has this statutory power.

Thus, the issue of delay is not resolved by the majority's opinion. Moreover, the majority's opinion does not address circumstances, like the present cases, where the MCCA was *not* afforded an opportunity to reject the agreements, which likely explains the $693.8 million bill that will be passed onto and shared by every Michigan automobile owner because of the increased and uncontrolled liability that the new majority's opinion will create for the MCCA.

We, as jurists, are ill-prepared to make complicated policy-based judgments unrelated to the policy choices that the Legislature has enacted. We do the least damage when we merely follow the Legislature's lead by giving words of a statute a plain reading and enforcing the statute as written. "The Legislature, unlike the judiciary, is institutionally equipped to assess the numerous trade-offs associated with a particular policy choice."[41] The Legislature has made difficult choices, and it used particular words with particular meanings to convey those choices. Our prior opinion respected our role as jurists, and the Legislature's role as policy-

---

[41] *Devillers*, *supra* at 589. Indeed, the new majority's response to my dissent underscores this point. The new majority asserts that "there is no evidence that defendant has routinely or even occasionally challenged the reasonableness of insurers' settlements" and "it is unknown whether the actuarial assessment factored in the effect of defendant's potential use of [MCL 500.3104(7)(g)]." *Ante* at 22. The Legislature, unlike this Court, has the means to obtain the answers to those questions.

17

maker, by interpreting the relevant statutory language in a manner consistent with the plain meaning of the words chosen by the Legislature. In an effort to avoid the meaning of the words chosen by the Legislature, the new majority has engaged in a wandering, policy-based analysis that is as flawed as it is misguided. It is an expensive mistake for which every policyholder in Michigan will pay.

Undeterred and aiming to quell the likely negative response to its policy-based decision, the new majority asserts that my concerns "appear[] highly speculative and, indeed, unfounded."[42] My concerns will cease to be "highly speculative" and "unfounded" when they are reflected in the MCCA's annual assessments. Michigan drivers will soon receive their no-fault insurance bills (I have received mine) with the updated higher MCCA assessment for the fiscal year beginning July 1, 2009. At that point, Michigan drivers will be free to determine for themselves whether my concerns are sound and based in reality.

Accordingly, I respectfully dissent.

Robert P. Young, Jr.
Maura D. Corrigan

---

[42] *Ante* at 21.

APPENDIX

STATE OF MICHIGAN

IN THE SUPREME COURT

UNITED STATES FIDELITY INSURANCE
& GUARANTY COMPANY, a foreign
corporation,                                          Case No. 133466

        Plaintiff-Appellee,                    Court of Appeals Case No. 260604

vs.                                                   Oakland Circuit Court No. 03-051485-CK

MICHIGAN CATASTROPHIC CLAIMS
ASSOCIATION, a non-profit Catastrophic
Claims Association,

        Defendant-Appellant.

---

### AFFIDAVIT OF GLORIA FREELAND IN SUPPORT OF APPELLANT'S SUPPLEMENT TO ITS ANSWER TO APPELLEE'S MOTION FOR REHEARING

I, Gloria Freeland, being first duly sworn, depose and swear:

1. I am the Executive Director of the Michigan Catastrophic Claims Association (the "MCCA"). I have held this position since 2007 and have been employed by the MCCA since 1991.

2. I have personal knowledge of the facts in the Affidavit, and if called upon to testify, I can do so competently.

3. Each year the MCCA's consulting actuaries estimate the loss and loss adjustment reserve expenses of the MCCA.

4. This year, as a direct result of the Michigan Supreme Court's March 27, 2009 order granting the appellees' motion for rehearing, the MCCA's actuaries recommended, and the Board of Directors accepted their recommendation, that the MCCA increase by 10% the estimated $645 million needed to pay claims expected to be incurred for the fiscal accident year beginning July 1, 2009. This represents an increase of $64.5 million.

5.     Further, the actuaries recommended, and the Board of Directors accepted their recommendation, that the MCCA increase its needed reserves as of December 31, 2008 by 5% or $629.3 million as a direct result of the signal sent by the Michigan Supreme Court in granting appellees' motion for rehearing.

6.     Increasing by $64.5 million the amount needed to pay claims expected to be incurred for the fiscal accident year beginning July 1, 2009, and increasing the MCCA's needed reserves by $629.3 million, are largely responsible for the increase of more than 19% in this year's assessment.

_Gloria Freeland_
Gloria Freeland

Dated: _April 8, 2009_

Subscribed and sworn to before me
this _8th_ day of April, 2009
_Karen M Nick_
Notary Public
My Commission Expires:

KAREN M. NICK
NOTARY PUBLIC, STATE OF MI
COUNTY OF WAYNE
MY COMMISSION EXPIRES Jun 1, 2014
ACTING IN COUNTY OF _Wayne_

AA01\225761.2
JD\KJM - 018940/0039

2

S T A T E   O F   M I C H I G A N

SUPREME COURT

UNITED STATES FIDELITY INSURANCE &
GUARANTY COMPANY,

      Plaintiff-Appellee,

v                                                           No. 133466

MICHIGAN CATASTROPHIC CLAIMS
ASSOCIATION,

      Defendant-Appellant,

and

MICHAEL MIGDAL, Individually and as
Conservator for the Estate of DANIEL MIGDAL,
a Protected Person,

      Defendant.

_____

HARTFORD INSURANCE COMPANY OF THE
MIDWEST,

      Plaintiff-Appellee,

v                                                           No. 133468

MICHIGAN CATASTROPHIC CLAIMS
ASSOCIATION,

      Defendant-Appellant.

_____

MARKMAN, J. (*dissenting*).

      I concur fully with the discussion in part IV of Justice Young's dissenting

opinion and therefore also dissent.

                                                       Stephen J. Markman